Marvin, J.,
(orally).
This is a suit brought by Mi;s. Daisy D. Wittenmeyer against the Board of Education of the village of Brooklyn to have that board enjoined from taking down or removing a school bouse built by them upon lots now owned by Mrs. Wittenmeyer.
The lots are lots No. 84 and 85 of the village of Brooklyn. *120 These lots were owned originally by C. L. Jones. In 1883 Jones executed to the Board of Education a lease for these two lots, this lease to determine and the term to end whenever the village of Brooklyn should be annexed to the city of Cleveland. The rental was $1.00 per year.
Immediately after the lease was made, or very soon thereafter — the lease was made in 1883 — the Board erected a school house on these lots, a frame building on a stone foundation, and the foundation set into the ground some two feet, and brick chimneys were built resting upon this foundation.
But the building was built and adapted to the purpose of a school house, and was used for that purpose up to the time or just before the time when this suit was commenced.
In 1886 Mr. Jones, who up to that time had owned these lots, deeded the same to his daughter, the plaintiff in this case. One of the considerations mentioned in that deed is a certain contract — and that contract, by the way, was executed on the same day that the deed was executed, on the 30th of October, 1886. In that contract were these words in regard to the property that was being conveyed — quite an amount of real estate was being conveyed to Mrs. Wittenmeyer, including lots 84 and 85, and the contract had this clause in it, “subject, however, so far as sub-lots 84 and 85 are concerned, to the lease held by the school board of Brooklyn village, and reserving to said school board, its successors and assigns, any rights they may have or should have therein under said lease and in the tenements and improvement by said school board placed upon said lots.” The deed had a similar provision, but my recollection is, the language was not exactly, although substantially, the same.
The village of Brooklyn was annexed to the city of Cleveland in November, 1S90. By the terms of the lease that ended the term. Whenever that annexation took place, the term granted by the lease ended by its own terms, leaving the premises with this school building thereon.
At the time of the annexation, and therefore at the time of *121 the termination of the lease, a school was being conducted in this building, and continued to be so conducted up to some time in the spring or summer of 1891; the only exception being the. Christmas holidays, when there was no school. Whatever school furniture and the like there was in the building remained there during that Christmas vacation, and then the school went on.
Very early, almost immediately after the annexation, negotiations were begun with Mrs. Wittenmeyer — negotiations on the part of the school board — for a lease from her. These negotiations resulted in a lease, dated the 30th day of January, 1891, made by Mrs. Wittenmeyer to the school board, and executed on her part by E. J. Hart, as her agent and attorney in fact. By the terms of this lease the premises were to be held under it from the 1st day of December, 1890, up to the 15th day of July, 1891. Although the date ofthe lease is the 30th day of January, 1891, the term began by the language of the lease, on the 30th day of December, 1890, and ended on the 15th day of July, 1891.
Some time in May, or about the first of June, 1891, the school board commenced to make its preparations, and was about to remove this building, and the suit was commenced on the 2nd day of June, 1891, during the term of this new lease, to prevent the destruction or removal of this building. This suit was brought in the court of common pleas, and after trial there, appealed to this court.
At the time this new lease was made, or during the negotiations for that lease, Mr. Hart, representing the plaintiff, and Mr. Selzer, representing the school board, had interviews; and it was asked on the part of Selzer, that there be in the new lease a stipulation showing that the building was owned by the school board. Mr. Hart stated that he was not authorized to execute a lease having such a clause, but that a lease might be executed leaving that question open. That matter was substantially discussed between these two men, that the lease might be executed leaving open the question as *122 to whether the building was the property of Mrs. Wittenmeyer or the property of the school board. This new lease contains no covenant or provision aboutthe surrendering of possession in the condition in which the premises now are; that provision, which is very commonly and ordinarily in leases, is omitted. This is a written lease — not the filling out of a printed blank — and nothing is said about the surrendering of the premises in the condition in which they are at the commencement of the lease.
Mrs. Wittenmeyer said upon the witness stand, that she did not know that the school board erected this building; but she must have meant by that, and did mean, simply that she did not know it in the sense that one on the witness stand could swear to it. By the contract which was made on the 30th day of October, 1886, and by the deed which she then took, she was certainly apprised of the fact that there was some sort of interest which the school board had in these premises, other than that contained in the lease, because the language of both the contract and the deed not only reserved their right under the lease, but also in the tenements and' improvements by said school board placed upon said lots.
The first question in this case to be determined, is whether this school building was such a building as that, if there had been no new lease and no transfer of the property from Jones to his daughter, the building could have been removed by Jones during the continuance of that lease. There are numerous authorities to establish that a building erected upon lots by tenants, for the purposes of trade, and for the purposes of conducting business, even though built upon solid foundations, may be removed by the tenants during the tenancy, and they come within the description of trade fixtures. I read from Ewell on Fixtures, page 95 : “ However, on the other hand, it was held in Van Ness v. Pacard, that a wooden building, two stories high in front, with a shed of one story, and a cellar of stone or brick, the principal building resting upon this stone or brick foundation, and having a brick chim *123 ney, erected by a tenant for years, who was a carpenter by trade, with a view of carrying on the business of a dairyman, and for the residence of his family and servants engaged in his said business, in which said house he also carried on carpenter work, was a trade fixture which might be pulled down and removed by the tenant. In delivering the opinion of the court, Stoby, J., observed that, ‘the question whether removable or not, does not depend upon the form or size of the building, whether it has a brick foundation or not, or is one or two stories high, or has a brick or other chimney. The sole question is whether it is designed for purposes of trade or not. A tenant may erect a large as well as a small messuage, or a sub-boilery, of one or two stories high, and on whatever foundations he may choose.’ On the whole, the tendency of modern authority, at least, in the United States, is believed to be adverse to the rule laid down in Whitehead v. Bennett, supra, that trade fixtures, or at least trade fixtures in the nature of buildings, to be removable, must either’he capable of being bodily removed, or taken in pieces and put up again so as to be identically what they were before such removal.” The whole of this section is devoted to this subject, and the conclusion of this writer, supported by numerous áuthorities, is that a building, though resting on a foundation of stone or brick, a building of brick, where it is erected for the purposes of the business, may be removed by the tenant during the continuance of the lease. It is well settled by authorities that where the time when the term of the lease will end is uncertain in the lease, if the improvements are of such a nature that they might be removed during the term of the lease, they may be removed within a feasonable time after the expiration of the term. In the nature of things that must be so, where one cannot know when his lease is to an end.
In Ewell on Fixtures, I read further on page 147: “ The rule that the right of removal must be exercised before the expiration of the tenancy is also necessarily subject to qualification in those cases where the tenancy is of uncertain duration, *124 and is liable to be determined by the happening of some contingent or uncertain event on which it depends, or by the act of the lessor, as in the case of a tenancy at will. In such a case the tenant’s right of removal is not terminated until after he has had a reasonable time, after the happening of the event, or the determination of his will by the lessor for the exercise of such a right.” We see no distinction in principle between the right to remove a building erected by a lessee for school purposes, and one erected by a lessee for the purposes of trade or other business.
So then it seems from what has been said — if what has been said is correct — that if no transfer had been made, if Jones had remained the owner of the property, the board might have removed its building not only during the term, but within a reasonable time after its expiration ; because the time of expiration was uncertain and depended upon a contingency which could not be controlled by the lessee.
But if a deed was accepted by this plaintiff without knowledge of the situation, without knowledge of what rights the school board had, and without knowledge of their claiming rights, a different question might arise from the one that does arise in this case.
We think that the language of the deed which she accepted, and of this contract which was made at the same time, sufficiently notified her that the school board erected this building and claimed a right in it. So that there remains only the question of whether, by accepting the new lease from Mrs. Wittenmeyer, there was a surrendering of rights, a surrendering of the estate held under the former lease in such wise as to preclude and prevent the lessee-from claiming the right to remove fixtures.
The authorities, as was demonstrated by counsel in this case, are not uniform on this subject. I think the authorities are much more numerous that the acceptance of the new lease was a surrendering of the rights under the old lease, and a yielding up of whatever right there was to remove the build *125 ing than those holding otherwise. But there is excellent authority for the proposition that it is not sueh a surrendering up. The cases cited in 69 Wisconsin and 39 Michigan, from one of which I will read later, sustain the proposition that the taking of the new lease was not such a surrendering as to deprive the tenant of his right to remove the building.
The cases cited in 45 N. Y., and 124 Mass., and other cases, sustain the contrary doctrine. In the case in 45 N. Y., Lough-ran v. Ross, there was a clause in the lease that the premises should be surrendered in good condition, natural wear and decay only excepted, at the expiration of the lease. In Watriss v. First National Bank of Cambridge, 124 Mass. 571, there was a clause in the lease that the premises should be surrendered up in as good condition as they were at the time of the execution of the lease, with certain exceptions, and the syllabus reads as follows: “A lessee, who, during the term, erects trade fixtures on the demised premises, and before the expiration of the term, accepts a new lease of the premises to commence at the expiration of the first term, contained different terms and conditions, making no reference to the old lease and reserving no right to him in such fixtures, and in which he covenants to deliver up the premises at the end of the term in as good condition ‘as the same now are/ can not remove the fixtures after the expiration of the first term, although his occupation has been continuous.” In the case mentioned in the 45 N. Y., there was such a clause, and although that is mentioned in the opinion of the court, no reference is made to it in the syllabus, and hence in that case the law, as announced by the court, seems to be directly in conflict with the decisions in Michigan and Wisconsin, to which our attention was called by counsel, and which we have concluded to follow. The Michigan ease is that of Amelia Kerr, Administratrix v. Solomon. O. Kingsberry et al., 39 Michigan, 150, and the court in the opinion say : “ In brief, the claim on the part of the complainants that when Kingsberry and Bennett, in January, 1876, accepted from J. *126 P. Kingsberry a new lease, they in contemplation of law surrendered the existing lease, and not having asserted and exercised a right to remove the erections made previously, they thereby abandoned them to their landlord, and could not assert or transfer to any one else the right to remove them afterwards. This is the principal question in the case. The right of a tenant to remove the erections made by him in furtherance of the purposes for which the premises were leased, is conceded. The principle which permits it is one of public policy, and has its foundation in the interest which society has that every person shall be encouraged to make the most beneficial use of his property the circumstances will admit of. On the other hand, the requirement that the tenant shall remove during his term, whenever he proposes to claim a right to remove at all, is based upon a corresponding rule of public policy, for the protection of the landlord, and which is that the tenant shall not be suffered, after he has surrendered the premises, to enter upon the possession of the landlord -or of a succeeding tenant, to remove fixtures which he might and ought to have taken away before. But why the right should be lost when the tenant, instead of surrendering possession, takes a renewal of his lease, is not very apparent. There is certainly no reason of public policy to sustain such adoctrine. On the contrary, the reasons which save to the tenant his right to the fixtures in the first place, are equally effectual to save to him on a renewal what was unquestionably his before. What could possibly be more absurd than a rule of law which should in effect say to the tenant who is about to obtain a renewal : ‘ If you will be at the expense and trouble, and incur the loss, of removing your erections during 1he term, and afterwards bring them back again, they shall be yours ; otherwise, you will be deemed to abandon them to your landlord.’ ” The judge, delivering the opinion, calls attention to authorities which sustain the contrary doctrine.
We have concluded in this case to follow the doctrine as laid down in this Michigan case, and in Wisconsin, to which *127 we were cited in the hearing, (it seems to us to be sound and to produce the right result), rather than to hold the contrary rule.
Hart & McCormick, and Blandin & Rice, for plaintiff.
T. K. Disselle, Heisley & Seher, and Lawrence, Estep, Well & Henry, for defendant.
The petition will therefore be dismissed.